FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 0 4 2018

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

INTERNATIONAL HUMAN RIGHTS
COMMISSION

                    Plaintiff,

vs.

U.S. CUSTOMS AND BORDER
PROTECTION
Office of the Chief Counsel
1300 Pennsylvania Ave, NW
Washington, DC 20229;

U.S. CUSTOMS AND BORDER
PROTECTION
Fines, Penalties, and Forfeitures Office
157 Tradeport Drive
Atlanta, GA 30354;

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
Office of the General Counsel
3801 Nebraska Avenue, NW
Washington, DC 20528;

U.S IMMIGRATION AND CUSTOMS
ENFORCEMENT
500 12th St., SW
Washington, D.C. 20536;

                    Defendants.

Civil Action No.

# 1:18-CV-0065

## COMPLAINT FOR REMISSION OR MITIGATION OF FORFEITURE AND INJUNCTIVE AND DECLARATORY RELIEF

On August 22, 2016, United States Immigration and Customs Enforcement ("ICE")

seized currency belonging to the International Human Rights Commission ("Plaintiff") via

the seizure of its funds being transported by its duly appointed diplomatic courier, Douglas

Hampton ("Courier"), a duly licensed member in good standing with the State Bar of

1

Michigan, for an alleged violation of 18 U.S.C. §§ 1960 at Atlanta, GA. On September 12, 2016, United States Customs and Border Protection ("CBP" or "Customs") issued a *Notice of Seizure and Information to Claimants Form CAFRA* ("Notice of Seizure"). A petition was timely filed by the Courier within thirty (30) days of CBP's Notice of Seizure with the United States Customs and Border Protection Fines, Penalties, and Forfeitures Office ("First Petition"), which was supplemented with additional information on November 2, 2016 ("Supplemental Information"), annexed hereto as **Exhibit A and Exhibit AA**. On July 7, 2017, another petition was filed by Robert Shumake, Ambassador at large and Deputy Chairman for the International Human Rights Commission, on behalf of the Plaintiff ("Second Petition"), annexed hereto as **Exhibit B**, as the seized funds were not returned, no administrative forfeiture proceedings were schedule pursuant to the First Petition, and no judicial forfeiture proceedings initiated against Courier. Numerous follow-ups with CBP's Atlanta office has yielded no information and the lack of judicial process afforded Plaintiff and its agents requires redress and relief.

I.     **JURISDICTION**

The Court has jurisdiction over this action under 28 U.S.C §1331, as Plaintiff's claims arise under federal law. Plaintiff is entitled to the immediate return of its monies because it is currently being held in violation of international customary law, International Organizations Immunities Act, the Fourth Amendment and because— following the unlawfully prolonged seizure—any attempt by the government to institute forfeiture proceedings as this point would violate due process under *United States v. $23,407.69 in U.S. Currency*, 715 F.2d 162 (5th Cir.1983).

II.   **VENUE**

Venue is proper in the United States District Court for the Northern District of
Georgia because the seizure of Plaintiff's monies occurred in Atlanta, Georgia.

III.   **BACKGROUND**

1.   Plaintiff is a nonprofit intergovernmental organization established per the Vienna
Convention by seven organizations on December 10, 1988.

2.   Plaintiff is represented in 46 countries and has established operations in the United
States through its Deputy Chairman, Ambassador Robert Shumake.[1]

3.   Plaintiff enjoys ECOSOC Special Consultative Status with the United Nations.[2]

4.   Plaintiff's mission is to promote implementation, dissemination of norms, rules and
guidelines in observance of international humanitarian law for peace, gender
equality, health, social equality, and economic development.  Plaintiff's current
projects in the area of education and housing development benefiting vulnerable
populations are in furtherance of its stated objective and charter.  See Donation
Letter to Sierra Leone Union of United Nations, **Exhibit C**;  See also African Diaspora

---

[1] Ambassador Shumake is the Diplomatic Ambassador of the IHRC to the United States of America.
Ambassador Shumake was appointed as the "Special Diplomatic Adviser of the IHRC" to look after
the IHRC interests in "American and African Regions."  Ambassador Shumake was appointed to be
responsible "to look after the business proposals which can enhance the working capital for the
organization working to help the countries in-need." Further, Ambassador Shumake was also
appointed as Ambassador by the Department of Foreign & International Affairs of the IHRC as the
"Head of Mission" "to enhance and develop the formal diplomatic/working relationship and
Humanitarian Mission for the people of the United States of America." As part of Ambassador
Shumake's duties and functions as the Head of Mission for the IHRC, he personally handles cash
funds and donations that belong to the IHRC Humanitarian Mission.

[2] See
http://esango.un.org/civilsociety/showProfileDetail.do?method=showProfileDetails&profileCode=6043
36.

3

Sustainability Partnership, https://hbcudigest.com/bethune-cookman-establishes-african-diaspora-sustainability-partnership/; See also https://www.ihrc.us/missions.

## IV.    SUMMARY OF FACTS

1. On August 22, 2016, Plaintiff's monies, being transported by an officially appointed courier, Douglas Hampton ("Courier"), was seized in transit from Atlanta, Georgia, en route to San Francisco, California.  Plaintiff's monies was destined for delivery to Ambassador Robert Shumake, Plaintiff's Deputy Chairman.

2. Plaintiff was in the process of opening offices in San Francisco and these funds were needed to conduct business.

3. The total amount of Plaintiff's monies seized was **$170,130.00**.

4. All of the currency belonged to the IHRC.

5. The IHRC's currency originated from charitable donations.

6. The money was located in the Courier's carry-on luggage along with its accompanying diplomatic documents.

7. The currency was bundled inside the Courier's carry-on in increments of $2,000.00-$5,000.00 and in denominations of $20's, $50's, and $100-dollar bills.

8. The Courier voluntarily processed his carry-on luggage through the United States Transportation Security Administration ("TSA") checkpoints and x-ray machines.

9. Upon information and belief, ICE agents approached the Courier requesting information about the amount of currency he was carrying.  The Courier voluntarily gave ICE agents a signed, stamped and sealed Direction Letter from the IHRC, which stated the specific amount of the currency, where it was going, and for what purpose.

4

10. Upon information and belief, the Courier gave ICE agents his IHRC Diplomatic Card (issued by World Chairman for the IHRC) and State of Michigan Bar Card, as outlined in the Official IHRC Direction Letter

11. Upon information and belief, ICE agents detained and questioned the Courier for two (2) hours.

12. Upon information and belief, ICE contacted Ambassador Shumake via telephone to discuss the matter.

13. Upon information and belief, the Courier was not read his legal rights.

14. Upon information and belief, CBP did not afford the Courier with an opportunity to speak with an attorney.

15. The Courier reasonably cooperated with ICE during their entire investigation.

16. ICE issued a *Custody Receipt for Seized Property and Evidence* to the Courier for an **undetermined amount** in U.S. currency.

17. ICE did not release any monies to the Courier.

18. On September 12, 2016, CBP issued a Notice of Seizure to Plaintiff's Courier.

19. CBP seized Plaintiff's currency in the amount of **$170,130.00** under Customs case number: 2016-1704-000366-01.

20. On September 26, 2016, the First Petition for Remission or Mitigation of Forfeiture was filed by the Courier.

21. On July 7, 2017, the Second Petition for Remission or Mitigation of Forfeiture was filed by Ambassador Robert Shumake on Plaintiff's behalf.

22. As of the date of this filing, the United States has not filed a forfeiture action against Plaintiff's seized property.

5

## V.    PLAINTIFF IS PROTECTED FROM INVIOLABILITY UNDER INTERNATIONAL LAW AND THE INTERNATIONAL ORGANIZATIONS IMMUNITIES ACT

The United States, in accordance with customary international laws, subscribes to the well-established international law of consular and diplomatic immunity. The International Organizations Immunities Act ("IOIA"), enacted by Congress in 1945, provides certain privileges and immunities for international organizations designated thereunder. 22 U.S.C. § 288a. Thereafter, the concept of Sovereign Immunity was adopted by the United States Department of State (the Tate Letter, 26 Dep't State Bull. 984 (1952)) and in 1976, it was codified by Congress in the Foreign Sovereign Immunities Act.[3]

The United States regards the Vienna Convention on the Law of Treaties to be customary international law (https://www/state/gov/s/l/treaty/faqs/70139.htm). As such, On June 24, 1949, Secretary of State Dean Acheson established the Bureau of International Organization Affairs (IO), an organization under the State Department, as part of the U.S. effort to meet the needs of post-World War II diplomacy. According to Department records, the new bureau's primary responsibilities were to "...promote the most effective use of the machinery of international organizations in the conduct of foreign affairs...act as the official channel between the United States and international organizations of an inter-regional character (https://www.state.gov/p/io/c34723.htm). Throughout its history, the Bureau of International Affairs has been responsible for U.S. participation in the United Nations, its technical specialized agencies, and other international organizations...IO

---

[3] 28 U.S.C. §§1602 et seq. See also Diplomatic Immunity: History and Overview - CRS Report for Congress, Order Code RS21672, November 19, 2003, https://www.everycrsreport.com/files/20031119_RS21672_076b3ccdf9ee6f191dd08f7a1612d555a236b5be.pdf. See also https://en.wikipedia.org/wiki/Diplomatic_immunity#The_beginnings_of_modern_diplomatic_immunity

6

works through multilateral engagement to advance strategic U.S. policies and interests and ensure that the UN and other international organizations remain effective through appropriate reform. Id.

## VI.    IHRC IS AN IGO UNDER THE VIENNA CONVENTION

An Intergovenmental Organization (IGO) is defined as "an organization composed primarily of sovereign states, or of other intergovernmental organizations."[4]  IGOs are established by treaty or other agreement that acts as a charter creating the group."[5] They are "entities created with sufficient organizational structure and autonomy to provide formal, ongoing, multilateral processes of decision making between states, along with the capacity to execute the collective will of their members (states)." [6] States as the term is used herein means sovereign nations as well as international organization established and functioning per tenets of the Vienna Convention.  The American judiciary in *Atkinson v. Inter-American Development Bank*, decided in 1998, echoed its agreement with this meaning and found that Congress's intention when it passed the International Organizations Immunities Act ("IOIA") was to grant to international organizations the same immunity as foreign sovereigns "as it existed in 1945—when immunity of foreign sovereigns was absolute."[7]

IGOs formed on the basis of the foregoing are de facto legitimate by their very establishment and function.  Plaintiff is a legitimate IGO as it was formed by seven organizations via charter on 12/10/88.  It is officially represented in 46 countries and was

---

[4] See Article 2 Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations Done at Vienna on 21 March 1986 (VCLT).
[5] Id.

[6] Volgy, Thomas J. *et al.* "Identifying Formal Intergovernmental organizations." *Journal of Peace Research* 45:6 (2008) pp. 849-862.

[7] See 156 F.3d 1335, 1341 (D.C. Cir. 1998).

7

formed to promote the implementation, dissemination of norms, rules and guidelines in observance of international humanitarian law for peace, gender equality, health, social equality, and economic development. Plaintiff's current projects in the area of education and housing development benefiting vulnerable populations are in furtherance of its stated objective and charter. The legitimacy of an IGO is not derived from its registration with the U.S. State Department, but by its establishment on tenets of well-established customary international law, such as The Law of Treaties established by the Vienna Convention.

## VII.  CUSTOMS VIOLATED THE VIENNA CONVENTION

Pursuant to the *Vienna Convention on the Representation of States in their Relations with International Organizations of a Universal Character 14 March 1975*, Articles 23 through 30, a courier acting on behalf of the IHRC shall not be detained or official diplomatic packages opened.  See http://legal.un.org/ilc/texts/instruments/english/conventions/5_1_1975.pdf (last visited Sept. 26, 2016).  Further, the contents of his [courier] bag may not be seized or forfeited.  Id. Accordingly, as a designated agent of Ambassador Shumake's office, Plaintiff's Courier was allowed to freely carryout his assignment on behalf of Plaintiff without government intrusion.  Thus, under the Vienna Convention, there were no grounds or authority to seize the currency.  Customs failed to respect Plaintiff's rights and privileges as an IGO under U.S. law and international customary law.  Therefore, seizure was improper in this case and Plaintiff should be entitled to remission of forfeiture.

Furthermore, "apart from the Immunities Act, treaties, or any applicable principles of international law, international organizations seem to derive a measure of protection from state and federal interference with their property and documents from the fourth, fifth, and fourteenth amendments to the United States Constitution" as "these amendments

8

apply to aliens within the jurisdiction of the United States. It does not seem unwarranted therefore to accord an international organization which is recognized as having juridical personality, including the capacity to hold property, the same protection that the amendments afford a corporation against arbitrary interference by government officials." *The Status of International Organizations under the Law of the United States* Harvard Law Review, Vol. 71, No. 7 (May 1958), pp. 1316-1317; Published by: The Harvard Law Review Association; Stable URL: http://www.jstor.org/stable/1338273.

## VIII. CUSTOMS FAILED TO ISSUE A PROPER NOTICE OF SEIZURE AND ESTABLISH PROBABLE CAUSE TO SEIZE THE CURRENCY

Pursuant to 18 U.S.C. § 981(b)(2)(B), warrantless seizures may be made by Customs if there is probable cause to believe that the property is subject to forfeiture. "When the government seizes property, due process requires that the person from whom the property is seized be notified timely of the probable cause for the seizure." U.S. Customs Service, Seized Asset Management and Enforcement Procedures Handbook at p. 31. Furthermore, pursuant to 19 C.F.R. § 162.31(b):

> (b) *Contents of notice*. The notice shall contain the following:
>
> (1) The provisions of law alleged to have been violated;
>
> **(2) A description of the specific acts or omissions forming the basis of the alleged violations;**
>
> (3) If the alleged violations involve the entry or attempted entry of merchandise,
>
>> (i) A description of the merchandise and the circumstances of its entry or attempted entry, and
>>
>> (ii) The identity of each entry, if specific entries are involved; and

9

(4) If the alleged violations involve a loss of revenue,

(i) The total loss of revenue and how it was computed, and

(ii) The loss of revenue attributable to each entry, if readily susceptible to calculation. (Emphasis added).

See also, Seized Asset Management and Enforcement Procedures Handbook at p. 32. Failure to provide due process may jeopardize the government's ability to forfeit the seized property and expose the seizing officer and/or FP&FO to a liability. Id. at 31. Therefore, an accurate and timely seizure notice is required to guarantee due process. Id.

Here, Customs is under the obligation to provide the specific acts or omissions forming the basis of the alleged violations within the seizure notice. See *supra* use of the word "shall." Under 18 U.S.C. § 1960 *Prohibition of unlicensed money transmitting businesses* makes it illegal to conduct or own an unlicensed money transmitting business. Here, the seizure notice does not specify the acts or omissions forming the basis of the 18 U.S.C. § 1960 violation. Customs merely provides that: **"[t]he property was seized and is subject to forfeiture under the provisions of title 21, United States Code, section 981 in violation of title 18, United States Code, section 1960 because the currency was the proceeds of, or traceable to, a specified unlawful activity to wit, an unlicensed money transmitting business."**

"Money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2). The term "business" restricts the offense to an enterprise conducted for profit and one engaged in more than a single qualifying transmission. United States v. Banki, 660 F.3d 665, 679 (2d Cir. 2011).

10

There are three categories of transmitting business.  18 U.S.C. § 1960(b)(1).  One consists of any transmission business operating in a state that requires it to be licensed and criminalizes the failure to do so.  18 U.S.C. § 1960(b)(1)(A).   The government must prove that the defendant knew that he was conducting a money transmitting business and that it was unlicensed.  United States v. Elfgeeh, 515 F.3d 100, 133 (2d Cir. 2008); United States v. Talebnejad, 460 F.3d 563, 568 (4th Cir. 2006); United States v. Mazza-Alaluf, 607 F.Supp.2d 484, 489 (S.D.N.Y. 2009), aff'd, 621 F.3d 205 (2d Cir. 2010) (conviction requires proof beyond a reasonable doubt that "1.) Mazza knowingly conducted, controlled, managed, supervised, directed, or owned 2.) a money-transmitting business that 3.) affected interstate or foreign commerce, and 4.) was not in compliance with applicable licensing requirements under either state or federal law").

The second category of unlicensed money transmitting businesses consists of any transmitting business operating in a manner that fails to comply with Treasury Department regulations governing such enterprises.  18 U.S.C. § 1960(b)(1)(B).   The government need not show that the defendant knew of federal regulatory requirements, but it must show that the defendant knew that he was operating a transmitting business. United States v. Talebnejad, 460 F.3d 563, 568 (4th Cir. 2006).

United States v. Uddin, 365 F. Supp. 2d 825, 828-30 (E.D. Mich. 2005).

The third category consists of any licensed business that transmits of money known to be derived from or intended to finance criminal activity even if the transmitter is duly licensed. 18 U.S.C. § 1960(b)(1)(C).

Here, Plaintiff was acting on behalf of the IHRC; an intergovernmental non-profit organization with the mission to promote humanitarian relief around the world.  Plaintiff

11

is a legitimate IGO as it was formed by seven organizations via charter on 12/10/88. It is officially represented in 46 countries and was formed to promote implementation, dissemination of norms, rules and guidelines in observance of international humanitarian law for peace, gender equality, health, social equality, and economic development. Plaintiff's current projects in the area of education and housing development benefiting vulnerable populations are in furtherance of its stated objective and charter.[8] Accordingly, Plaintiff was not acting on behalf of a "business" nor did it have the intent on conducting, controlling, managing, supervising, directing, or owning a money-transmitting business. As a result, probable cause for unlicensed money transmitting was not met. Therefore, seizure was improper in this case and Plaintiff should be entitled to remission of forfeiture.

## IX. CUSTOMS FAILED TO MEET ITS BURDEN OF PROOF

CBP cannot carry its burden of proof that the seized currency is subject to forfeiture pursuant to 18 U.S.C. § 983(c) which states:

> (c) **Burden of Proof.** — In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property—
>
> (1) **the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;**
>
> (2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and
>
> (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal

---

[8] See Donation Letter to Sierra Leone Union of United Nations, **Exhibit C**; See also African Diaspora Sustainability Partnership, https://hbcudigest.com/bethune-cookman-establishes-african-diaspora-sustainability-partnership/; See also https://www.ihrc.us/missions.

offense, the Government shall establish that there was a
substantial connection between the property and the offense.
(emphasis added).

CBP does not have any evidence that the seized currency was used to commit or

facilitate the commission of a criminal offense, or was involved in a criminal offense.

Further, as discussed herein, **Customs failed to provide any specific acts or**

**omissions within the Notice of Seizure forming the basis of the alleged violations**

**that would meet the threshold for preponderance of the evidence.**[9] Moreover, CBP

has no record evidence that there is a substantial nexus between the seized currency and

any criminal activity under 18 U.S.C. § 1960.  As explained herein, the currency was

derived from a legal source and intended for legal purposes.  Therefore, Customs has not

met its burden of proof, seizure was improper in this case, and as a result, Plaintiff should

be entitled to remission of forfeiture.

## X.     A FORFEITURE IN THIS CASE IS DISPROPORTIONAL TO THE GRAVITY OF THE OFFENSE

Forfeiture of Plaintiff's currency is unlawful, stands in violation of international law

and laws of the United States governing such matters and is to be reviewed for

constitutional excessiveness. 18 U.S.C. § 983(g); Austin v. United States, 113 S. Ct. 2801

(1993). As there was no legal grounds on which to seize Plaintiff's monies, the Eighth

Amendment to the Constitution of the United States prohibits the assessment of excessive

fines – seizure of Plaintiff's monies is a fine.  The Eighth Amendment provides that:

"Excessive bail should not be required, nor excessive fines imposed, nor cruel and inhuman

---

[9] See 19 C.F.R. § 162.31(b) requiring "a description of the **specific acts or omissions** forming the basis of the alleged violations." Emphasis added.

13

punishment inflicted." U.S. Const. amend. VIII.  Forfeitures are "fines" within the meaning
of the Eighth Amendment if they "constitute punishment for an offense." United States v.
Bajakajian, 524 U.S. 321, 328 (1998)

      In determining whether a fine should be deemed excessive, "the court shall compare
the forfeiture to the gravity of the offense giving rise to the forfeiture." 18 U.S.C. §
983(g)(2).  Moreover, the Supreme Court established a standard: "[A] punitive forfeiture
violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a
defendant's offense." Bajakajian. 524 U.S. at 321; 18 U.S.C. § 983(g)(3).  No offense or
charges have been levied against Plaintiff or its Courier.  Bajakajian involved a criminal
forfeiture, however the court had previously held that civil forfeitures fall within the scope
of the Eighth Amendment. See Hudson v. United States, 522 U.S. 93, 103 (1997).  In
Bajakajian. the Supreme Court considered four factors in weighing the gravity of the
defendant's offense: (1) the nature and extent of the crime, (2) whether the violation was
related to other illegal activities, (3) the other penalties that may be imposed for the
violation, and (4) the extent of the harm caused. See Bajakajian. 524 U.S. at 337-40.
Additionally, courts have considered whether the forfeiture would deprive the claimant of
his livelihood. Id at 339-40 & n.15; see also. U.S. v. Jose. 499 F.3d 105 (1st Cir., 2007).  If
the forfeiture is grossly disproportional to the offense the court shall reduce or eliminate
the forfeiture. 18 U.S.C. § 983(g)(4).

      The Department of Justice, Office of the Inspector General ("OIG") has conducted its
own reviews, audits and investigations into asset forfeiture by law enforcement and found
numerous, valid, concerns about the excessive use of the law and its resulting violation of
civil liberties. See Review of the Department's Oversight of Cash Seizure and Forfeiture
Activities, Evaluation and Inspections Division 17-02, March 2017 ("Report"), annexed

14

hereto as **Exhibit D**.  In its Report, the OIG concluded that, *"[w]e found that the Department and its investigative components do not use aggregate data to evaluate fully and oversee their seizure operations, or to determine whether seizures benefit criminal investigations or the extent to which they may pose potential risks to civil liberties."* Id at ii. The Report *"found that 85 of the 100 seizures occurred as a result of interdiction operations at transportation facilities, such as airports, parcel distribution centers, train stations, and bus terminals, or as a result of a highway interdiction or traffic stop. All but 6 of the 85 encounters or situations that led to interdiction seizures were initiated on the observations and immediate judgment of DEA agents and task force officers absent any preexisting intelligence of a specific drug crime (the remaining six were based on preexisting intelligence). This is particularly relevant in light of the findings in our 2015 report highlighting potential risks to civil liberties associated with cold consent encounters that occur during transportation interdiction operations."* Id at iii.  Plaintiff is a victim of U.S. law enforcement—CBP—arbitrary seizure and handling of monies under U.S. seizure and forfeiture laws, which has subjected Plaintiff and its agents to civil liberties violations, which also violate well established international laws and customs.

In light of these factors the Court should conclude that a forfeiture of

**$170,130.00** was in violation of not only international and U.S. law, but was also excessive and in violation of the Excessive Fine Clause of the Eighth Amendment of the U.S. Constitution.  First, Customs has offered no evidence indication that Plaintiff's funds are proceeds to any illegal activity and CBP has not produced any record of illegal activity. Second, the currency is lawful; **originating from Plaintiff's charitable donations intended to be used to conduct its humanitarian mission.  Specifically, opening up an office in San Francisco and towards a water purification processing plant**

15

in Kenya.

Regarding the third factor, the courts look to "other penalties that the Legislature has authorized" and the "maximum penalties that could have been imposed under the Sentencing Guidelines" as measures of the gravity of the offense. See United States v. 3814 NW Thurman St., 164 F.3d 1191, 1197 (9th Cir.1999). However, the maximum penalties under the Guidelines should be given greater weight than the maximum penalty authorized by statute, because the Guidelines take into consideration the specific level of culpability of the offender. 3814 NW Thurman St., 164 F.3d at 1197. When a claimant was not criminally prosecuted no fine could be imposed. 3814 NW Thurman St., 164 F.3d at 1197.

Here, Plaintiff's Courier was not criminally prosecuted, as a result, a fine cannot be imposed against him or the Plaintiff. Lastly, there was no harm on the United States; Plaintiff did not cause loss to the public fisc. Thus, under the Bajakjian test, enforcement of a $170,130.00 forfeiture is excessive because it is disproportional to the offense – which has not been stated by Customs – and consequently, violates the Excessive Fines Clause. Therefore, seizure was improper in this case and Plaintiff should be entitled to remission of forfeiture.

## XI.    DOCUMENTARY EVIDENCE IS NOT REQUIRED

Plaintiff is not obligated to provide documentation to support the legitimate source and use of the seized currency. See 18 U.S.C. § 983(a)(2)(C)(ii). Originally, 18 U.S.C. § 983(a)(2)(C)(ii) required Plaintiff to: "state the claimant's interest in such property (and provide customary documentary evidence of such interest, if available) and state that the claim is not frivolous." However, United States Senator Leahy of Vermont stated that: "[T]he inserted language gives seizing agencies too much discretion to reject claims because

16

the documentary evidence is incomplete or otherwise unsatisfactory, and prior experience tells us that agencies may exercise their discretion to deny claims arbitrarily." 146 Cong Rec. S11184, S11185 (daily ed. Oct. 26, 2000). Therefore, Senator Leahy had an amendment signed into law on December 21, 2000 that strikes the language of 18 U.S.C. § 983(a)(2)(C)(ii) requiring customary documentary evidence of the claimant's interest. David B. Smith, Prosecution and Defense of Forfeiture Cases, § 6.02[4][b], 6-32 (2008). Nevertheless, Plaintiff has cooperated and provided all necessary documentation to identify the source of its funds.

Additionally, in the legislative proceedings leading up to the passage of the Civil Asset Reform Act of 2000 it was stated: "Lastly, '[a]n owner does not have to prove where he obtained money until the government demonstrates that it has [met its burden] to believe the money is forfeitable.' $506, 232 in U.S. Currency, 125 F.3d at 454[sic], 453." 146 CONG. REC. at H2049-H2051; DOJ EXTRACT. (statement of Rep. Hyde). Therefore, there is no law or federal regulation that requires such a disclosure of documents.

## XII.   REQUESTED INFORMATION PROVIDED IN GOOD FAITH TO SETTLE THIS MATTER ADMINISTRATIVELY

Notwithstanding that documentary evidence is not required as discussed in Section XI of this Complaint, the Plaintiff provided the following information, explanation, and documentation in its Petitions in a good faith effort to resolve this administratively. See **Exhibit B.**

- Official correspondence from Plaintiff to its Courier regarding the transportation of U.S. currency.
- Ambassador Robert Shumake's Identification Card and Appointment Letter.

17

- The IHRC website evidencing Ambassador Shumake as the Ambassador to the United States.

- Donor Affidavit letter

- Donor Acknowledgment Letter

- Donor Award

- Bank Statement

## XIII. APPLICATION OF THE MOD ACT

Customs cannot enforce a forfeiture because Plaintiff through its Courier has proved a legal source and legal use of the seized currency. Additionally, Customs has not provided any sufficient FOIA records/evidence of Plaintiff's wrongdoing, and it has not proven that the Plaintiff was involved in any illegal activity.

According to Customs Administrative Enforcement Process: Fines, Penalties,

Forfeitures and Liquidated Damages, preface (February 2004):

> Two concepts that emerge from the Mod Act are '**informed compliance**' and '**shared responsibility**,' which are remised on the idea that in order to maximize voluntary compliance with laws and regulations of U.S. Customs and Border Protection, the trade community needs to be clearly and completely informed of its legal obligations. Accordingly, the Mod imposes a greater obligation on C.B.P. to provide the public with improved information concerning the trade community's rights and responsibilities under Customs regulations and related laws.  (Emphasis added).

Plaintiff's Courier should have been informed and assisted with the legalities concerning the currency seized in this case. If ICE gave Plaintiff's Courier an opportunity to explain the legal source and use of funds ICE would have avoided seizure in this case.

18

ICE has not maintained its shared responsibility of working with Plaintiff and its Courier to avoid the unreasonable costs and delays of referring this matter for forfeiture proceedings. Plaintiff's Courier was forced to endure an unreasonably long investigation leading to finally being released without any currency for humanitarian purposes. Therefore, CBP may fulfill its obligation and remedy the alleged violation by remitting the seized currency to Plaintiff.

## XIV. CONCLUSION

CBP cannot deny the fact that the basis for the seizure was improper and did not occur as charged; there is no record evidence of criminal activity in this case. Even though not required to, Plaintiff submitted sufficient evidence that is probative of the claim that the seized currency was derived from legal sources, and that its intended use was for legal purposes. It would be in the government's best interest to remit or mitigate forfeiture at this time.

A decision on this matter should have been **timely and without unreasonable delay made**. See United States v. Von Neumann, 474 U.S. 242, 251 (1986). Plaintiff's Petitions for Remission of Mitigation of Forfeiture was made on September 26, 2016 and on July 7, 2017 through its Courier and Deputy Chairman via Counsel. To date, said Petitions has been unanswered by the Defendants. Plaintiff hereby request the release of the seized currency pursuant to the above referenced international customary law, federal guidelines, statutes, and case law.

## XV.   Prayer For Relief

WHEREFORE, Plaintiff prays that this Court:

A) Declare that Defendants have violated the Vienna Convention and IOIA;

19

B) Declare that Defendants did not have probably cause to detain Plaintiff's Courier and seize its monies;

C) Declare that Defendant's violated Plaintiff and its Courier due process rights;

D) Declare that Defendants failed to meet their burden of proof to establish violations by Plaintiff and/or its Courier;

E) Declare that seizure of Plaintiff's monies was constitutionally excessive;

F) Order Defendants to promptly return Plaintiff's monies in the amount of $170,130.00;

G) Award Plaintiff costs and reasonable attorneys' fees incurred in this action; and

H) Grant such other relief as the Court may deem just and proper.


DATED: January 3, 2018                  Respectfully submitted


                                        By:  _____

                                        Nicole Birch
                                        GA Bar No. 057404
                                        nbirch@hbassociateslaw.com
                                        HB Associates, PC
                                        100 River Run
                                        Roswell, GA 30075
                                        678.768.8937
                                        *Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues in this case to which the right to a trial by jury is afforded.

/s/ Nicole Birch
Nicole Birch
GA Bar No. 057404
nbirch@hbassociateslaw.com
HB Associates, PC
100 River Run
Roswell, GA 30075
678.768.8937
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing **COMPLAINT**

**FOR REMISSION OR MITIGATION OF FORFEITURE AND INJUNCTIVE AND**

**DECLARATORY RELIEF** with the Clerk of Court using the Odyssey E-file system which will

automatically send electronic mail notification of such filing to all counsel of record.

I further certify that I caused a copy of the foregoing Complaint to be sent by certified mail

to the following addressed:


U.S. CUSTOMS AND BORDER PROTECTION
Office of the Chief Counsel
1300 Pennsylvania Ave, NW
Washington, DC 20229;

U.S. CUSTOMS AND BORDER PROTECTION
Fines, Penalties, and Forfeitures Office
157 Tradeport Drive
Atlanta, GA 30354;

UNITED STATES DEPARTMENT OF HOMELAND SECURITY
Office of the General Counsel
3801 Nebraska Avenue, NW
Washington, DC 20528;

U.S IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th St., SW
Washington, D.C. 20536;


This 3rd day of January, 2018.

                                        */s/ Nicole Birch*
                                        Nicole Birch